IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| B. MICHAEL WHITMORE, | : | CIVIL ACTION |
|     Plaintiff, | : | |
| | : | |
|     v. | : | |
| | : | NO. 14-2393 |
| CAROLYN W. COLVIN, | : | |
| Acting Commissioner of the | : | |
| Social Security Administration, | : | |
|     Defendant. | : | |

**REPORT AND RECOMMENDATION**

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                                                  April 22, 2016

      This action was brought pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final decision of the Commissioner of the Social Security Administration (the "Commissioner"), which gave a "partially favorable" decision to the application of B. Michael Whitmore (alternatively "Whitmore" or "Plaintiff"). Plaintiff prevailed on his claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 301, *et seq.* (the "Act"), but not for Disability Insurance Benefits ("DIB") under Title II of the Act. Presently before the Court is the "Plaintiff's Brief and Statement of Issues in Support of Request for Review" ("Pl. Br.") (Doc. No. 10); "Defendant's Response to Request for Review of Plaintiff" ("Def. Br.") (Doc. No. 14); and "Plaintiff's Reply Brief" ("Pl. Re.") (Doc. No. 16); together with the record of the proceedings before the Administrative Law Judge Daniel Rubini ("ALJ") and the Appeals Council (Doc. No. 9).

      Plaintiff asks the Court to vacate the Commissioner's final administrative decision, which found him disabled as of May 1, 2011, but not before, meaning that he was determined to be not disabled as of his June 6, 2010 alleged onset date. Inasmuch as the ALJ found that Plaintiff was

insured for DIB only through December 31, 2010, Plaintiff alternatively seeks a determination by this Court that his disability began "prior to December 31, 2010." (Pl. Br. at 1.)[1] The Commissioner seeks the entry of an order affirming the decision of the ALJ that Plaintiff was not disabled prior to May 1, 2011. (Def. Br. at 2, 13.) Accordingly, we limit our discussion to the question of whether substantial evidence supports the ALJ's conclusion that the Plaintiff was not disabled prior to May 1, 2011 or at any time before his DIB insured status expired on December 31, 2010.[2] For the reasons set out below, we recommend that the Court deny Plaintiff's request for review and enter its order affirming the ALJ's decision.

I.   FACTUAL AND PROCEDURAL HISTORY

Whitmore protectively filed the applications for SSI and DIB giving rise to this litigation on February 24, 2011 alleging a period of disability beginning June 6, 2010. (R. 149-162.) At the time of his application, he was 51 years old, had completed high school, previously worked as a laborer and machine operator, and had been self-employed. (R. 149, 174, 186.) He complained of migraine headaches, degenerative changes in the right knee, lower back pain, major depressive disorder, generalized anxiety disorder and bipolar disorder. (Pl. Br. at 3.) At the time of the hearing, he was divorced and living by himself. (R. 39.)

Whitmore was incarcerated from June 2010 until October 2010 for non-payment of child support. (R. 357, 509-79.) Following his release, he lived at Safe Harbour, a homeless shelter. (R. 357.) On November 8, 2010, he was evaluated at the Lehigh Valley Community Mental

---

[1] In order to receive DIB under Title II, the claimant must show that his disability began prior to his date last insured ("DLI").

[2] In this regard, and as we discuss further within, the Commissioner now contends that Plaintiff's DLI is, in fact, September 30, 2010, which would mean that he would have to prove that his disability began before that date in order to have any DIB eligibility. As we find that the Commissioner's determination that he was not disabled before May 1, 2011 is supported by substantial evidence, we need not discuss this point any further.

2

Health Center by Thomas Miller, M.A. (R. 357-71.) He presented with depression, mild headaches and panic attacks two to three times a day. (R. 358.) Upon examination, Mr. Miller found Whitmore to be oriented, cooperative, and appropriately dressed and groomed, although his mood was sad and anxious with appropriate affect and coherent speech. (R. 371.) He did not have psychotic symptoms at that time but experienced "fleeting" suicidal thoughts. (*Id.*) He was given a global assessment of functioning ("GAF") score of 40, indicating serious symptoms.[3] (*Id.*)

On November 12, 2010 he was evaluated by a psychiatrist, Joel Carr, D.O., M.P.H., who described Plaintiff's attitude and behavior as "irritable," "impulsive," "agitated," "aggressive," "enraged," and "seclusive." (R. 372.) He presented as well groomed and casual and his speech was normal. (*Id.*) His affect was described as "anxious," "angry," "frustrated" and "labile" and his mood was noted as "anxious," "irritable" and "depressed." (R. 373.) Exam notes show that he had low self-esteem, and depressive and grandiose thoughts. (*Id.*) His recent memory was "fair," his intelligence was estimated as "average" and his insight and judgment were "fair." (R. 374.) His GAF score was 50, indicating serious symptoms. (*Id.*) Plaintiff next saw Mr. Miller on November 15, 2010 and reported no panic attacks in the last week and stated that he was "now primarily depressed" and "isolative." (R. 481.) Mr. Miller saw him again on December 9, 2010 and noted no discernible change since the last visit. (R. 480.)

---

[3] The GAF scale considers the psychological, social, and occupational functioning of an individual on a hypothetical continuum of mental health or illness. *See Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition* ("DSM-IV") 30-32 (4th ed. 1994). Pursuant to the standards of the American Psychiatric Association, a GAF score of 41-50 reflects an opinion that the patient has "serious symptoms (e.g., suicidal ideation, severe obsessive rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV at 34. A GAF score of 51-60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning." *Id.*

In December 2010, Whitmore treated with Dr. Carr again, and reported that he was still anxious, although Dr. Carr noted "slight improvement" from the last visit. (R. 421.) He was oriented, appropriately dressed and groomed and had normal speech, but had an anxious mood and thought process. (*Id.*) He was diagnosed with bipolar disorder, mixed without psychosis. (R. 421-22.) Plaintiff saw his therapist again on December 13 and complained of "trembling so much that I cannot eat," and in a January visit, noted that he had used alcohol recently "as an escape." (R. 478-79.) In February 2011, Plaintiff reported he was "ok," although still experiencing panic attacks, and his therapy notes state that he denied having an alcohol problem and seemed "very happy." (R. 423, 477.) He was appropriately dressed and groomed, cooperative, and oriented with an anxious mood, broad affect, and coherent thought process. (*Id.*)

His March 5, 2011 Function Report states that he was able to watch TV, go to group sessions, eat meals, read, see his children, go to the library, clean, and attend doctor's appointments. (R. 195.) He listed "work" as the only thing he could not do then that he could do before his alleged disability. (*Id.*) He was able to prepare his own meals daily, do laundry, shop for food, play the guitar, sing and build model airplanes "when I can." (R. 198-99.) Whitmore described difficulty in concentrating for a long period of time and a lack of interest. (R. 199.) He stated that he could only lift about 20 pounds and he had difficulty kneeling and standing for prolonged periods of time. (R. 200.) He reported that he could walk about a quarter of a mile before needing to stop and rest for two to three minutes before resuming. (*Id.*) He also stated that he was "ok" with authority figures and changes in routine, but did not handle stress well. (*Id.*)

At a further check-up on March 14, 2011, he reported that he had run out of medication,

4

was feeling very anxious and had not slept the day before. (R. 424.) He was cooperative and oriented with a coherent thought process and anxious mood. (*Id.*) He had no suicidal or homicidal ideation. (*Id.*) His therapist's notes from that same day show that Plaintiff felt "disoriented/wobbly." (R. 476)

On March 16, 2011, Plaintiff admitted himself to Lehigh Valley Hospital for "extreme anxiety and agitation." (R. 225-38.) Upon admittance, he was disoriented and thought he was at Moravian College. (R. 277.) He stated that he ran out of his medication several days prior, as he was taking extra doses in order to calm himself down. (R. 225.) He reported several panic attacks, a "racing" heart, tremors, lack of sleep and excessive cleaning of his apartment. (*Id.*) He stated that Seroquel medication had helped these symptoms in the past. (R. 227.) On examination, Whitmore was cooperative, had normal speech and thought process and a flat affect. (R. 229.) He had no hallucinations, delusions or suicidal or homicidal ideations. (*Id.*) He was diagnosed with bipolar disorder and his medication was increased. (R. 225.) Notes also indicate that staff at the Lodge, a mental health facility where he had lived for the past six weeks, referred to a change in his behavior beginning on March 12, 2011. (R. 324.) He had run out of medication, was increasingly anxious, appeared disheveled and could not complete sentences. (*Id.*) Whitmore denied using alcohol for more than six months and denied using cocaine for more than five years. (*Id.*) He was given a GAF score of 30. (R. 325.)

He remained hospitalized for four days. (R. 225, 339.) Treatment notes state that the increased medication had a "positive therapeutic effect" and by the end of his hospitalization, he felt "normal" and "positive about going home and getting on with his life" and stated that the "medication was working." (*Id.*) He saw a psychiatrist at the Lehigh Valley Community Mental Health Center on March 25, 2011 and brought his case worker. (R. 419.) The doctor noted that

no medication was given, as Plaintiff had been given enough medication from the hospital. (*Id.*)

On April 15, 2011, Whitmore told his psychiatrist at the Mental Health Center that he was "doing all right." (R. 417.) He reported being out of medication and having sleep disturbances, as well as a stable mood. (*Id.*) On examination, he was appropriately dressed and groomed, cooperative, oriented and had normal speech with an anxious mood and broad affect. (*Id.*) His thought process was coherent and he did not have suicidal or homicidal ideation. (*Id.*)

On April 26, 2011, Plaintiff had a consultative exam with William G. Lee, Ph.D., a psychologist. (R. 299.) His appearance and dress were appropriate and he was cooperative for the examination. (*Id.*) He stated that his medication included Lamictal, Lexapro, Seroquel and Ambien. (*Id.*) He reported that he had been in inpatient substance abuse treatment in 2009 for alcohol and heroin abuse, and was currently attending an intensive outpatient substance abuse program. (R. 300.) He stated he had been heroin-free for two years and alcohol-free for the past three months. (*Id.*) He last worked two and a half years ago. (*Id.*) On examination, Dr. Lee noted that Whitmore had no unusual mannerisms, although his speech was "somewhat slowed" and his affect was "somewhat blunted." (*Id.*) Notes show that Plaintiff reported "a number of symptoms of depressed mood, including sadness, loss of pleasure, past failure, self-criticalness, fleeting suicidal thoughts, crying, agitation, concentration difficulties, tiredness, loss of energy, sleep and appetite disturbance, and indecisiveness." (*Id.*) He also reported symptoms of anxiety, "such as being unable to relax, fear of worse happening, feeling unsteady, feeling terrified, hands trembling, and fear of losing control." (*Id.*) Whitmore's "stream of thought" was "somewhat slowed but goal-directed" and his abstract thinking skills and fund of factual information were "generally intact." (R. 301.) He had difficulty performing serial 7s but was able to do simple

multiplication.[4] (*Id.*) His memory skills, both recent and remote, were intact, his orientation was adequate, and his social judgment and test judgment were slightly impaired. (*Id.*) Dr. Lee diagnosed him with mood disorder NOS and ruled out bipolar disorder and generalized anxiety disorder, as "there were not enough symptoms to substantiate these diagnoses." (*Id.*) Whitmore was given a GAF score of 55, indicating moderate symptoms. (*Id.*)

Dr. Lee completed a "medical/clinical source statement" wherein he found Plaintiff had slight limitations in "understand[ing] and remember[ing] short and simple instructions," "carry[ing] out short and simple instructions" and "interact[ing] appropriately with the public." (R. 302.) Dr. Lee found he had moderate limitations in "understand[ing] and remember[ing] detailed instructions," "carry[ing] out detailed instructions," "mak[ing] judgments on simple work-related decisions," "interact[ing] appropriately to supervisors" and "coworkers," "respond[ing] appropriately to work pressures in a usual work setting," and "respond[ing] appropriately to changes in a routine work setting." (*Id.*)

On May 13, 2011, Whitmore reported being "less stressed out now" and said he missed his family. (R. 418.) He complained of more anxiety during the day, but did not have any side effects from his medication nor any suicidal thoughts. (*Id.*) On examination, he was appropriately dressed and groomed, cooperative, oriented and had normal speech with a calm mood and broad affect. (*Id.*) His thought process was coherent and he did not have suicidal or homicidal ideation. (*Id.*)

Regarding Whitmore's physical health, the record first mentions left knee pathology in May 2008, when he reported that he had fallen on his left knee while carrying heavy tiles up

---

[4] A serial sevens test is "a test of mental status. The patient is asked to subtract 7 from 100 and to take 7 from that value and continue serially. *Serial Sevens Test*, MCGRAW-HILL CONCISE DICTIONARY OF MODERN MEDICINE (2002), http://medical-dictionary.thefreedictionary.com/serial+sevens+test

stairs. (R. 486.) He complained of knee pain, "locking, popping, giving away of the knee, effusions and swelling." (*Id.*) His doctor, Farah Mirza, D.O., prescribed Vicodin and the record shows that X-rays and an MRI of the his left knee were ordered but never performed. (R. 486-87.) In 2009, while incarcerated for a DUI, he complained of left knee pain, reported that "activity makes it better," and requested Motrin for the pain. (R. 551.) He continued working until June 6, 2010, at which time he was a laborer for a pallet company. (R. 186.) The record does not contain any further medical documentation of Plaintiff's left knee pathology until May 2011.

On May 20, 2011, Whitmore underwent a consultative exam by Linda Blose, M.D. (R. 305-11.) Dr. Blose observed that his only medical complaint was bilateral knee pain, and he reported having arthroscopic surgery two to three years ago on his right knee to shave cartilage. (R. 305.) Notes state that since then, his left knee progressed with increasing pain and decreased range of motion, but he did not have health insurance to cover left knee surgery. (*Id.*) He reported pain while walking, climbing steps, kneeling, bending and crouching. (*Id.*) He said he stopped working installing flooring two years ago because he "could not stand being on his knees," and only takes Tylenol for the pain now. (*Id.*) He stated he could walk at least one city block and was able to climb steps if he did so "slowly." (*Id.*) On examination, Dr. Blose noted "marked crepitation of both knees bilaterally," with the left knee worse than the right. (R. 307.) She also noted decreased range of motion bilaterally, with the left knee worse than the right. (*Id.*)

Dr. Blose completed a medical source statement where she found Whitmore was able to frequently lift and carry 20 pounds and occasionally lift and carry 25 pounds. (R. 308.) She found that he had no limitations in sitting or pushing and pulling, but could only stand "1 hour or

less" in an eight hour workday. (*Id.*) The doctor also noted that he could occasionally bend, stoop, balance and climb, but could never kneel or crouch. (R. 309.) She found no other physical or environmental limitations. (*Id.*)

At his hearing, Plaintiff testified that he was working twelve hours a week as a barista at a café within the Lodge. (R. 20-21.) He stated that when he gets "overwhelmed" while working, he can start shaking and need to go into a nearby conference room until it stops. (R. 21.) This happened approximately once a week, and four times during his six weeks of work, he needed to go home due to the shaking. (R. 24-25.) He was living alone at an apartment, funded by the Lodge. (R. 39.) He also testified that he cared for his ailing parents beginning in 2009 and ending in April 2010 when his mother passed away. (R. 28.) Whitmore told the ALJ that he had last used heroin in February of 2012 and last had alcohol four years before. (R. 34.) He reported migraine headaches twice a week that were severe enough that they interfered with his ability to work two to three times a month. (R. 40.) He testified that he played the guitar and sang at the Lodge a "maybe half a dozen times" for about an hour. (R. 32-34.)

On June 7, 2011, following the development and presentation of the medical evidence, the SSA issued a denial as to both of his applications. (R. 69-89.) He then requested a hearing. (R. 105-06.) The request was granted and ALJ Rubini held a hearing on September 26, 2012. (R. 17-68.) On November 26, 2012, the ALJ issued a partially favorable decision, finding that Whitmore was disabled beginning May 1, 2011, but not prior to that date. (R. 571-86.) The Appeals Council denied Whitmore's request for review on February 28, 2014 (R. 1-6), making the ALJ's decision the final decision of the Commissioner. 20 C.F.R. § 404.984. Plaintiff initiated this action on April 23, 2014, challenging his non-disability status from November, 8, 2010, his amended alleged onset date, through May 1, 2011. (Doc. 1.)

## II. STANDARD OF REVIEW

This Court must determine whether substantial evidence supports the Commissioner's final decision. 42 U.S.C. § 405(g); *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is "more than a mere scintilla but may be somewhat less than a preponderance of evidence." *Rutherford*, 399 F.3d at 552. The factual findings of the Commissioner must be accepted as conclusive, provided they are supported by substantial evidence. *Richardson*, 402 U.S. at 390 (citing 42 U.S.C. § 405(g)); *Rutherford*, 399 F.3d at 552. The review of legal questions presented by the Commissioner's final decision, however, is plenary. *Shaudeck v. Commissioner of Social Security Admin.*, 181 F.3d 429, 431 (3d Cir. 1999).

## III. DECISION UNDER REVIEW

In making his determination that Whitmore was not disabled within the meaning of the Act, prior to May 1, 2011, but was disabled from May 1, 2011, the ALJ relied upon the familiar five-step sequential evaluation process set forth in 20 C.F.R. §§ 416.920(a) and 404.1520(a). At Step One, he found that Whitmore had not engaged in substantial gainful activity since his alleged onset date of June 6, 2010. (R. 578, Finding No. 2.) At Step Two, he found that Plaintiff suffered from severe impairments, namely "degenerative changes to the left knee; polysubstance abuse; major depressive disorder; bipolar disorder and generalized anxiety disorder." (R. 578, Finding No. 3.) At Step Three, the ALJ concluded that he did not have an impairment or combination of impairments that satisfied the criteria of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, specifically Listings 1.02, 12.04, and 12.06, requiring that the evaluation process continue. (R. 578-79, Finding No. 4.)

The ALJ then assessed Whitmore's residual functional capacity ("RFC"), and determined that:

> prior to May 1, 2011, the date the claimant became disabled, the claimant had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except that he was limited to unskilled, routine, repetitive work, with limited public contact through only occasional simple transactions; and a lower end of the concentration, attention and stress spectrum.[5]

(R. 579-83, Finding No. 5.)

Continuing to Step Four, the ALJ found that Whitmore was unable to perform any past relevant work. (R. 584, Finding No. 7.) At Step Five, prior to May, 1, 2011, considering his age, education, work experience and RFC, and relying upon testimony offered at the hearing by the vocational expert ("VE"), the ALJ concluded that he had the residual functional capacity to perform "light work" such as "assembler," "laundry worker," and "packer" as long as his limitations were accommodated. (R. 585, Finding No. 11.) Additionally, the ALJ found that beginning on May 1, 2011, considering the claimant's age, education, work experience, and RFC, there were no jobs that existed in significant numbers in the national economy that claimant could perform. (R. 586, Finding No. 12.) Accordingly, the ALJ found that Whitmore was not disabled prior to May 1, 2011 but became disabled on that date and continued to be disabled through the date of the decision. (R. 586, Finding No. 13.) Finally, the ALJ concluded that Whitmore was not under a disability within the meaning of the Act at any time through December 31, 2010, his date last insured. (R. 586, Finding No. 14.) Our task is limited to determining whether substantial evidence supports the ALJ's decision that Plaintiff was not disabled prior to May 1, 2011.

---

[5] The ALJ also found that, beginning on May 1, 2011, Whitmore was disabled due to "the combination of his mental and physical impairments." (R. 583-84, Finding No. 6.) Plaintiff does not appeal that finding.

11

## IV. DISCUSSION

Whitmore sets out two reasons why we should reverse and remand his case for a further hearing or calculation of benefits. (Pl. Br. at 7.) First, he argues that the ALJ erred in determining his RFC from June 6, 2010 through May 1, 2011.[6] (*Id.* at 7-14.) Within this argument, he specifically points to the ALJ's finding that he had the ability to perform work "on a regular and predictable basis." (*Id.* at 16-17.) He further contends that the ALJ erred by disregarding the opinion of Dr. Blose concerning his exertional level, "without citing to competing medical evidence that refutes her opinion." (*Id.* at 14-16.)

The Commissioner counters by arguing, for the first time, that the ALJ erred in finding that Plaintiff's DLI was December 31, 2010, when in fact, it was September 30, 2010. Were we to accept the Commissioner's argument that the correct DLI was September 30, 2010, Whitmore would be unable to obtain DIB. In his appeal, Plaintiff amended his alleged onset date to November 8, 2010, which would, under the Commissioner's argument for a September 2010 DLI, still preclude him from receiving DIB even if he were found disabled during that time period. The record is conflicting on this issue, with different DLIs noted. (*Compare* R. 69, 91, 174, 203 with R. 163.) Given the untimeliness of the Commissioner in raising this issue and the fact that the ALJ did not have it before him, we would likely remand for a full development of the relevant evidence. It is not necessary for us to do so, however, as a change of the DLI from December 31, 2010 to September 30, 2010 will not affect the outcome of this case, given our conclusion that the ALJ's decision that Whitmore was not disabled before May 1, 2011 is supported by substantial evidence. We will address each of Plaintiff's issues in turn.

---

[6] We note that Plaintiff has amended his alleged onset date to November 8, 2010 (Pl. Br. at 8), though his brief at times refers to his original alleged onset date of June 6, 2010.

**A. The ALJ's Finding that Whitmore was Capable of Performing Light Work With Some Limitations Prior to May 1, 2011**

Whitmore contends that he provided substantial evidence which shows he was unable to function "at any exertional level from June 6, 2010 through the present." (Pl. Br. at 8.) He cites several pieces of evidence from the record that he states were "overlooked, misinterpreted or disregarded" by the ALJ that would have compelled a finding that he was disabled prior to May 1, 2011. (*Id.*) In particular, he points to records from the Lehigh Valley Community Mental Health Center, therapy notes, his Social Security Disability Report, records from his hospitalization at Lehigh Valley Hospital, Dr. Lee's psychological consultative exam report and Dr. Blose's physical consultative exam. (*Id.* at 8-12.) Whitmore states that his access to health care was limited due to his incarceration and destitution, and contends that the ALJ should have drawn "indicia of disability from other evidence, including the claimant's testimony, as well as information from other sources." (*Id.* at 13.)

In his decision, the ALJ limited Whitmore to "light work" prior to May 1, 2011 with additional conditions that the work be "unskilled, routine, repetitive work, with limited public contact through only occasional simple transactions; and a lower end of the concentration, attention and stress spectrum." With regard to his physical impairment, the record is sparse. The ALJ acknowledged the initial left knee injury in 2008, but noted that no X-ray or MRI were ever performed. (R. 580-81.) The ALJ also observed that there was "no follow up treatment for this condition and he continued to work in 2009 after the incident." (R. 580.) Even so, the ALJ limited Whitmore to a light exertional level due to his knee, giving him "the benefit of the doubt." (*Id.*) The ALJ also noted that despite his alleged functional limitations, his March 2011 Function Report showed that he was able to prepare meals, visit his children, go to the library,

13

attend doctor's appointments, clean, drive, shop in stores, handle his finances, play the guitar, sing, build model airplanes, do laundry and spend time with others. (*Id.*) These activities, together with the limited medical support for Plaintiff's position and conservative treatment, substantially support the ALJ's determination that he was physically capable of work at the light exertional level prior to May 1, 2011.

With regard to his mental health limitations, the ALJ found the record supported the fact that he had a history of alcohol abuse, major depressive disorder, generalized anxiety disorder and bipolar disorder. (R. 581.) The ALJ discussed Whitmore's hospitalization at the Lehigh Valley Hospital at length. (R. 581-82.) He stated that Plaintiff's statements made at the hospital regarding the last time he had used heroin or alcohol were "not entirely consistent with his description of his sobriety in April 2011." (R. 581.) In March, Whitmore denied using alcohol in the past six months and denied using cocaine in the past five years. (R. 324.) In April, he reported being heroin free for the past two years and alcohol-free for the past three months. (R. 300.) The ALJ also found that his GAF score of 30, while admitted to Lehigh Valley Hospital, was "not indicative of the claimant's functional abilities as they would be if the claimant were compliant with his medication and thus should not be interpreted as representative of his maximum functional ability, as his abilities could have been expected to increase with medication compliance." (R. 581.) The ALJ again noted Whitmore's non-compliance with the medication, by taking extra doses and then running out, and discussed that by the end of his hospitalization, he felt "normal" and that the medication was "working with no side effects." (*Id.*)

Regarding the opinion evidence, the ALJ gave "great weight" to the opinion of consultative examiner, Dr. Lee, a phycologist, for the period prior to May 1, 2011, as he found it

was consistent with Plaintiff's daily activities and the objective medical evidence. (R. 582.) Plaintiff, in his brief, argues that the VE found that if the ALJ adopted Dr. Lee's evaluation, he could not work, as the number of "moderate" restrictions found would preclude work. (Pl. Br. at 10.) However, a review of the record reveals that the VE answered the ALJ's question about whether the restrictions in Dr. Lee's report would eliminate any jobs already listed as follows:

> **VE**: This is one that I didn't have a definition of moderate addressed. And if the definition is able to function adequately sometimes then I would say that the amount of moderate restrictions would preclude all competitive work. If the moderate is in the middle of five limitations going from none, to slight, to moderate, to marked and extreme then it wouldn't have a significant impact. So, I'm a loss for that. The only thing addressing that particular exhibit, if the GAF score is at 55, I would have to assume that to get a GAF score that high, moderate would – could not be totally work preclusive or it won't be consistent with the GAF score.
>
> **ALJ**: And if that moderate were defined as occasional limitations?
>
> **VE**: Then that would be more consistent with a GAF score of 55 and I believe that it would allow for simple, routine, unskilled work within the additional restrictions you placed.

(R. 60.) As the ALJ discussed, Dr. Lee gave Whitmore a GAF score of 55, indicating moderate functional limitations, and found he had only slight limitations in his abilities to understand, remember, and carry out short and simple instructions and moderate limitations in all other areas. (R. 582.) The ALJ also considered a state agency medical consultant's opinion, on record review, which found that Plaintiff was able to perform routine work in a stable environment, as it was consistent with his daily activities and the objective medical evidence prior to May 1, 2011. (R. 86, 583.)

We conclude that the ALJ's review of the record prior to May 1, 2011 supports his finding that Whitmore could perform "light work" while accounting for his mental impairments

by limiting him to "unskilled, routine, repetitive work with limited public contact through only occasional simple transactions; and at the lower end of the concentration, attention and stress spectrum." (R. 579.) In addition to objective medical evidence, Plaintiff's extensive and varied activities of daily living and his positive response to medication when administered properly support the ALJ's RFC finding prior to May 1, 2011.

Plaintiff also argues that he was incapable of performing work on a "regular and predictable basis" due to his symptoms, including panic attacks, racing thoughts, a short fuse, and depressive symptoms. (Pl. Br. at 16-17.) He challenges the ALJ's RFC finding on these grounds. Our analysis of the ALJ's decision remains the same. We conclude that the ALJ properly considered Whitmore's mental limitations, including his ability to function on pace and regularly, prior to May 1, 2011 in forming his RFC and the hypothetical posed to the VE. The ALJ accounted for his mental health limitations, supported by the record, by limiting him to "unskilled, routine, repetitive work, with limited public contact through only occasional simple transactions; and a lower end of the concentration, attention and stress spectrum." (R. 579.)

**B. The ALJ's Consideration of Dr. Blose's Opinion Regarding Whitmore's Exertional Level Prior to May 1, 2011**

Whitmore next argues that the ALJ erred in evaluating the opinion of consultative examiner, Dr. Blose. (Pl. Br. at 14-16.) On May 20, 2011, 19 days after the ALJ concluded that Plaintiff was disabled, Dr. Blose found that he could frequently lift and carry 20 pounds; occasionally lift and carry 25 pounds; stand and walk for one hour or less during an eight-hour workday; and had no sitting, pushing or pulling limitations. (R. 308.) The ALJ gave Dr. Blose's opinion "partial weight" and found the lifting/carrying and standing/walking limitations consistent with other medical evidence, beginning on May 1, 2011. (R. 583.) However, he

16

found that the doctor's opinion as to Whitmore's sitting abilities was an "overestimate of his functional abilities." (R. 583-84.)

Plaintiff contends that the ALJ erred because Dr. Blose's opinion, which would support a finding that he was able to perform sedentary work only, was "uncontradicted" in the record and the ALJ "is not permitted to render a medical opinion in the absence of conflicting evidence." (Pl. Br. at 14-15.) Plaintiff argues that, if the ALJ had fully credited Dr. Blose's opinion, it would have led to a finding that Plaintiff would be unable to perform the full range of "light work" as it "requires standing or walking, off and on, for a total of approximately 6 hours of an 8 hour workday." SSR 83-10.

We first note that Dr. Blose examined Plaintiff after the date the ALJ found him to be disabled, and therefore, her opinion may not be considered directly applicable to his claim for disability prior to May 1, 2011. (R. 305-11.) However, we acknowledge that a medical opinion rendered after the date of disability may be helpful in determining the severity of Plaintiff's limitations during the period of November 8, 2010 through May, 1, 2011. In determining what weight to give a medical opinion, an ALJ must consider certain factors, including: the examining relationship, the treating relationship, supportability, and consistency with the record as a whole. 20 C.F.R. §§ 404.1527(d), 416.927(d). Here, the ALJ appropriately considered the opinion of Dr. Blose, a consultative examiner who examined Plaintiff *after* he was found disabled, and weighed that opinion against other record evidence for the time period prior to May 1.

Accordingly, we find that there is sufficient support within the record that Whitmore was capable of "light work" prior to May 1, 2011. As discussed, *supra*, the record contains evidence of his activities of daily living and lack of medical treatment for his knee that the ALJ found significant in determining his RFC for "light work." Contrary to Plaintiff's assertion that Dr.

Blose's opinion was "uncontradicted" for the period prior to May 1, there was sufficient evidence in that time period for the ALJ to find that he was physically capable of "light work." The ALJ considered the dearth of medical treatment for his knees and still chose to give Whitmore "the benefit of the doubt" in restricting him to "light work." (R. 580.) We conclude that the ALJ appropriately considered Dr. Blose's opinion and, further, that there was sufficient evidence to support the ALJ's RFC for light work for the relevant time period in this appeal.

## V.     CONCLUSION

As set forth above, we conclude that there was substantial evidence to support the ALJ's RFC finding that Plaintiff could perform "light work" with other accommodations, prior to May 1, 2011. Further, we conclude that the ALJ properly considered the opinion of consultative examiner, Dr. Blose, in rendering a decision. We see no basis to disturb the ALJ's conclusion that Plaintiff was not disabled prior to May 1, 2011. We need not address the issue of Whitmore's DLI, brought by the Commissioner in Whitmore's appeal, as the above analysis renders the discussion of his DLI moot. Our recommendation follows.

## **RECOMMENDATION**

**AND NOW**, this 22nd day of April, 2016, upon consideration of the brief in support of review filed by Plaintiff, Defendant's response thereto, and Plaintiff's reply thereto (Doc. Nos. 10, 14 & 16), as well as the administrative record, it is respectfully **RECOMMENDED** that that the decision of the Commissioner be **AFFIRMED** and plaintiff's request for review be **DENIED** consistent with this Report.

BY THE COURT:


/s/ David R. Strawbridge
DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE